Roman P. SYVOCK, Sr., Plaintiff-Appellant, Cross-Appellee,

v.

**MILWAUKEE BOILER MANUFACTURING CO., INC., Defendant-Appellee, Cross-Appellant.**

Nos. 80–2851, 81–1022.

United States Court of Appeals, Seventh Circuit.

Argued May 15, 1981.

Decided Nov. 24, 1981.

As Corrected Dec. 24, 1981.

Arthur Heitzer, Milwaukee, Wis., for plaintiff-appellant, cross-appellee.

Willard P. Techmeier, Milwaukee, Wis., for defendant-appellee, cross-appellant.

Before FAIRCHILD and PELL, Circuit Judges, and LARSON,* Senior District Judge.

PELL, Circuit Judge.

The plaintiff, Roman Syvock (Syvock), sued his former employer, the Milwaukee Boiler Manufacturing Company (Milwaukee Boiler), for laying off and failing to rehire him in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (1976) (Act or ADEA). The liability phase of the case was tried to a jury which found that the employer had discriminated against Syvock and that its discrimination was willful. A finding of willfulness entitles a plaintiff to liquidated damages under section 7(b) of the Act, 29 U.S.C. § 626(b) (1976), which essentially doubles the award for backpay and benefits. Before commencing the damages phase of the trial, the judge responded to the defendant's motion for a judgment notwithstanding the verdict, or alternatively, for a new trial. The court upheld the jury's finding of discrimination, but withheld a decision on the willfulness finding until after the damages portion of the case was tried. After the bench trial on damages, the judge granted a judgment notwithstanding the verdict to the defendant on the jury's finding of willfulness. This prevented a doubling of damages. At the same time, the court determined that Syvock had failed to mitigate his damages, and accordingly reduced its damage calculations from $21,-716.97 to $3,750.00. Subsequently, the court awarded $3,850 in attorney's fees although the plaintiff had requested over $30,000.

The plaintiff appeals the trial court's grant of judgment notwithstanding the verdict on the willfulness issue, its reduction of backpay, and the amount of attorney's fees awarded. Milwaukee Boiler cross-appeals the judge's denial of its motion for judgment notwithstanding the verdict or a new trial on the jury's finding of liability in the first instance.

---

* Earl R. Larson, Senior District Judge for the District of Minnesota, is sitting by designation.

## I.  Facts Adduced at Trial

Syvock was hired by the defendant company as a welder in 1974 and was laid off, ostensibly for lack of work, approximately two years later at the age of forty-five.

The parties' proof at trial as to Syvock's usefulness to the company was conflicting. To the extent that any consensus emerges from the testimony, Syvock was an above-average welder but not a particularly good fitter,[1] he was less industrious and, as a result, less productive than some of the other employees, and he was less versatile than some of the other workers.

For example, James Oberhofer, a night supervisor, testified to his recommendation that Syvock be laid off due to lack of usefulness.  Oberhofer evaluated the plaintiff's productivity as low and recounted Syvock's refusal to perform a particular job which the plaintiff perceived as dangerous.  The witness also testified that Syvock was not qualified to perform one other specific task available during the work slowdown.  Oberhofer felt that Syvock generally avoided work: "[W]hen he welded, he was welding all right but ... he was a worker that would be gone quite a bit, would be to me dodging work."

One temporary supervisor testified, by contrast, that Syvock was one of Milwaukee Boiler's better workers, and was far more accomplished than other welders retained when the plaintiff was laid off.

Gerhard Sell, who supervised the plaintiff for most of the balance of Syvock's employment with Milwaukee Boiler, had consistently rated Syvock's performance as at least "fair," and often "good," and had approved raises for Syvock on at least three occasions.  Sell subsequently indicated that he could not explain these earlier positive evaluations in light of his deposition and trial testimony that Syvock's performance was below average and his production was poor.

The plaintiff presented evidence that other younger, less-accomplished welders who had not been employed by Milwaukee Boiler as long as Syvock[2] were retained when Syvock was laid off even though several had disciplinary reprimands in their files and one had actually received a three-day suspension for absenteeism.  Moreover, two younger welders, Reynolds and Cobb, who were laid off at the same time as the plaintiff, but who had received lesser overall performance ratings on their final layoff-dated evaluations, were subsequently recalled although Syvock was never rehired.  The evidence did, however, suggest several possible nondiscriminatory reasons for their recall.  Fisher testified that Reynolds and Cobb were rehired because of their versatility.  He represented that those employees were certified to perform "procedure 13," but that Syvock was not.  The company's certification log books did not list Syvock as being qualified on "procedure 13," although the plaintiff testified that he had been certified.  Fisher also recalled that Cobb and Reynolds persistently requested reemployment.  Syvock, on the other hand, did not ask to be rehired until January, 1977, eight months after his termination.  The plaintiff did not request reemployment with Milwaukee Boiler at any time subsequent to January, 1977.  Finally, both Syvock and a former coworker, Maurice Bates, expressed the belief that Reynolds and Cobb had con-

1.  Arden Meyer, who supervised Syvock during 1974, testified that Syvock's work on one particular fitting project had been unproductive.  The plaintiff indicated that his job classification at Milwaukee Boiler entitled him to perform both welding and fitting tasks.  A fitter works from blueprints to assemble and lightly tack together a project which is later completed by a welder.

2.  The plaintiff argues that his layoff and recall decisions were made in apparent disregard for the company's written policy of laying off first, and rehiring last, the least senior employees when a work force reduction is necessary provided that the more senior employee's skills are at least equal to those of the newer workers.  Because Milwaukee Boiler was not unionized, this policy was not part of a collective bargaining contract.  The evidence conflicted as to whether Syvock's work actually was equivalent overall to that of other employees retained.  Moreover, the plaintiff failed to show that the company normally implemented its written policy with respect to other employees.

sidered suing Milwaukee Boiler for race discrimination which may have influenced the company's decision to recall them, but not Syvock.

When the company's workload began increasing again in the fall of 1976, the defendant hired seven new young welders, most of whom were poorly qualified and either quit or were terminated within a short time. Robert Hajduk, a former employee who was considerably younger than Syvock, however, was laid off for lack of work in February of 1977 and never rehired. Analogously, Royce Rhode and Matt Kupiecki, welders retained by the company after Syvock's discharge, were older than the plaintiff, but as Syvock demonstrated, they were also more senior. One of Syvock's supervisors, Gerhard Sell, also older than the plaintiff, was still employed by the company at the time of trial. Yet another welder older than Syvock, Mr. Paddock, had been laid off before the plaintiff, but was rehired in August 1976 after Syvock's discharge. Both Syvock and Paddock had been hired in 1974.

Although the plaintiff's layoff notice indicated by its terms that it was "permanent," and suggested that the recipient seek other employment, the plaintiff indicated that he regarded the layoff as only temporary. Perhaps based on this belief, Syvock did not vigorously search for work for approximately three weeks after his termination. Syvock testified that he subsequently undertook a much more aggressive search by reporting to the Wisconsin Job Service one to three times a week, screening newspapers, and personally visiting numerous employers. The plaintiff represented that from June, 1976, until he gained employment in 1977,[3] he spent approximately twenty-four hours per week searching for work. The defendant did not show that Syvock had declined any job offers, but its

witness, an employee from the Wisconsin Job Service, testified that in 1977 there were approximately 275 job openings for the category of "welder and flame cutter" in the Milwaukee metropolitan area. The plaintiff's job opportunities may have been limited somewhat, however, since he did not own an automobile during his period of unemployment, and he possessed a criminal conviction record.

## II. The Finding of Discrimination

The standard for determining whether a judgment notwithstanding the verdict (JNOV) should be granted is whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is insufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed. *Appleman v. United States*, 338 F.2d 729, 730 (7th Cir. 1964), *cert. denied*, 380 U.S. 956, 85 S.Ct. 1090, 13 L.Ed.2d 972 (1965). Any conflicts in the evidence must be resolved in favor of the resisting party, and every permissible inference favoring that party which can be drawn from the evidence must be drawn. *Wisconsin Liquor Co. v. Park & Tilford Distillers Corp.*, 267 F.2d 928, 930 n.1 (7th Cir. 1959). An appellate court applies the same standard as the trial court when reviewing the trial judge's ruling on a JNOV motion. *C-Suzanne Beauty Salon, Ltd. v. General Insurance Co. of America*, 574 F.2d 106, 112 n.10 (2d Cir. 1978).

We reject the defendant's argument that the district judge erred by not granting a JNOV on the issue of liability. Although the plaintiff's showing of age discrimination was not strong, especially in view of the conflicting nature of the evidence, the standards for granting the mo-

**3.** In November 1977, Syvock performed janitorial services at a hospital under a job program requirement for obtaining welfare benefits after his unemployment compensation terminated. From December 1977 through July 1979, Syvock obtained welding work at two different foundries at lower rates of pay than he had received at Milwaukee Boiler. The plaintiff voluntarily terminated his employment at the first foundry in June 1978, and did not work again until August 1978. Syvock retained his job at the second foundry until shortly before he was hired by the Chicago, Milwaukee, St. Paul, and Pacific Railroad Company to perform repair and maintenance welding beginning August 1979.

tion are stringent. After having thoroughly reviewed the record, we are satisfied that there was sufficient evidence from which a reasonable jury could find that Milwaukee Boiler discriminated against the plaintiff by reason of age. The same is not true, however, with respect to the jury's finding of willfulness.

## III. The Finding of Willfulness

### A. The Appropriate Standard

The ADEA is enforced in accordance with the powers, remedies, and procedures provided under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201–219 (1976), with certain specified exceptions. In contrast to the automatic doubling of damages for violations of the FLSA, 29 U.S.C. § 216(b),[4] section 7(b) of the ADEA, 29 U.S.C. § 626(b) (1976), allows liquidated damages only in the event of willful violations of the Act. If such liquidated damages are allowed, they are equivalent to the amount of back pay and benefits denied the plaintiff by the employer. Neither the statute nor its legislative history has defined the term "willful."

This court has not previously determined the standard for willfulness under 29 U.S.C. § 626(b) (1976). Other courts of appeals have reached divergent interpretations of the term. The First Circuit has defined willfulness to require that the employer's discriminatory act be voluntary, intentional, and done with specific intent to violate the Act. Loeb v. Textron, Inc., 600 F.2d 1003, 1020 n.27 (1st Cir. 1979).

In Wehr v. Burroughs Corp., 619 F.2d 276, 283 (3d Cir. 1980), the court upheld a finding of willfulness on a jury instruction that defined "willful" as action that was deliberate, intentional, and knowing. The Third Circuit went on to add, however, that the instruction placed a higher burden on the plaintiff than was required by the Act: willfulness under 29 U.S.C. § 626(b) (1976) could also be found if the plaintiff proved "that the discharge was precipitated in reckless disregard of the consequences." Id. (dicta). The court did not specify whether liability under the ADEA constituted the "consequences" to which it referred.[5]

The Ninth Circuit, in Kelly v. American Standard, Inc., 640 F.2d 974, 980 (9th Cir. 1981), rejected the "specific intent" approach of the First Circuit because this standard "could have the anomalous effect of encouraging employers to know as little as possible about the ADEA so that they would not be liable for liquidated damages." The Kelly court expressed approval of the Wehr opinion but rejected the Third Circuit's standard insofar as it equated willfulness with reckless conduct. Id. at 980 n.7.

■ Congress, in our opinion, intended that liability under the ADEA could be established without any showing as to the defendant's state of mind. E. g., Kelly v. American Standard, Inc., 640 F.2d 974, 980, 981 (9th Cir. 1981); Walker v. Pettit Construction Co., 605 F.2d 128, 131 (4th Cir.), mod. on other grounds sub nom. Frith v. Eastern Air Lines, Inc., 611 F.2d 950 (4th Cir. 1979); see Houser v. Sears, Roebuck & Co., 627 F.2d 756, 757 (5th Cir. 1980). It is equally clear that, by allowing liquidated damages only for a "willful" violation, 29 U.S.C. § 626(b) (1976), Congress did not

---

4. Section 11 of the Portal to Portal Act, 29 U.S.C. § 260 (1976), mitigates this result somewhat by stating that liquidated damages need not be paid if the employer shows that his action or omission was in good faith. Section 11 of the Portal to Portal Act was not expressly incorporated into the ADEA and the weight of authority is that no "good faith" showing, as such by the employer is required under the ADEA. E. g., Kelly v. American Standard, Inc., 640 F.2d 974, 981 (9th Cir. 1981); Wehr v. Burroughs Corp., 619 F.2d 276, 279 (3d Cir. 1980); Loeb v. Textron, Inc., 600 F.2d 1003, 1020 (1st Cir. 1979). But see Hays v. Republic Steel Corp., 531 F.2d 1307 (5th Cir. 1976).

5. In Goodman v. Heublein, Inc., 645 F.2d 127 (2d Cir. 1981), the Second Circuit appeared to endorse the Wehr standard. It interpreted the Third Circuit's recklessness standard as requiring a showing that the employer acted with reckless disregard as to whether its conduct was prohibited by the ADEA. Id. at 131 (dicta).

intend the doubling of damages to be automatic. Those courts which have found willfulness to exist on a showing of recklessness have answered the argument that their standard leads to such an automatic doubling [6] by pointing out that this is not the case when the plaintiff relies on statistical evidence to establish his prima facie case. *E. g., Goodman v. Heublein, Inc.*, 645 F.2d 127, 131 n.6 (2d Cir. 1981); *Kelly v. American Standard, Inc.*, 640 F.2d 974, 980 n.9 (9th Cir. 1981).

One could readily conclude from this reasoning that liquidated damages will always be available to a plaintiff who establishes liability under the ADEA on a discriminatory intent rather than a discriminatory impact theory. *See Goodman v. Heublein, Inc.*, 645 F.2d 127, 131 n.6 (2d Cir. 1981). We find nothing in 29 U.S.C. § 626(b) (1976), or in the legislative history of the ADEA, to support such a result.[7]

In fact, the legislative history of the ADEA suggests that the Congressional framers thought that non-willful discrimination directed towards an individual was quite possible. Unlike race discrimination, age discrimination may simply arise from an *unconscious* application of stereotyped notions of ability rather than from a deliberate desire to remove older employees from the workforce:

> Age discrimination is not the same as the insidious discrimination based on race or creed prejudices and bigotry. Those discriminations result in nonemployment because of feelings about a person entirely unrelated to his ability to do a job. This is hardly a problem for the older jobseeker. Discrimination arises for him because of assumptions that are made about the effects of age on performance. As a general rule, ability is ageless.

113 Cong.Rec. 34,742 (1967) (remarks of Rep. Burke).[8]

The standard for willfulness therefore should focus on the defendant's state of mind at the time the allegedly discriminatory acts occurred. It must distinguish those situations in which an employer consciously discriminates against an employee because of age from those in which the discrimination is unconscious. This distinction is just as necessary in disparate treatment cases as it is when the plaintiff sues on a discriminatory impact theory. We think that a finding of willfulness should lie only if there is some showing as to the defendant's knowledge of the illegality of his actions.[9] We

---

**6.** *See, e. g.,* Smith & Leggette, *Recent Issues in Litigation Under the Age Discrimination in Employment Act*, 41 Ohio St.L.J. 349, 369 (1980).

**7.** In Title VII cases alleging disparate treatment under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), "[p]roof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977). If an inference of discriminatory motive were also crucial to recovery upon a disparate treatment theory under the ADEA, one could conclude that any ADEA violation premised upon disparate treatment is intentional and therefore liquidated damages should be automatic. As stated above, however, we agree with those courts that have allowed a finding of liability under the ADEA without any showing as to the defendant's state of mind.

**8.** *See also* 113 Cong.Rec. 34,752 (remarks of Rep. Dwyer), 31,254 (remarks of Rep. Javits) (1967); *Vazquez v. Eastern Air Lines, Inc.*, 579 F.2d 107, 112 (1st Cir. 1978); Smith & Leggette, *Recent Issues in Litigation Under the Age Discrimination in Employment Act*, 41 Ohio St.L.J. 349, 371 (1980); Note, *The Age Discrimination in Employment Act of 1967*, 90 Harv.L.Rev. 380, 383–84 (1976); Note, *The Cost of Growing Old: Business Necessity and the Age Discrimination in Employment Act*, 88 Yale L.J. 565, 579 (1979) ("Whatever the level of employer awareness, these [stereotyped] assumptions are hard to detect precisely because they are so intimately related to other judgments about employment."); Rosen & Jerdee, *Too old or not too old*, 55 Harv.Bus.Rev. 97, 98 (1977) (Survey responses to hypothetical situations suggested that "differential treatment of older and younger employees ... was the result of respondents' unconscious age stereotypes rather than conscious discrimination.)".

**9.** This is consistent with the standard endorsed in dicta by the Second Circuit, *Goodman v. Heublein, Inc.*, 645 F.2d 127, 131 (2d Cir. 1981), and with that court's interpretation of the standard articulated by the Third Circuit in *Wehr v. Burroughs Corp.*, 619 F.2d 276, 283 (3d Cir. 1980).

hold that, in order to prove willfulness under 29 U.S.C. § 626(b) (1976), a plaintiff must show that the defendant's actions were knowing and voluntary and that he knew or reasonably should have known that those actions violated the ADEA.[10]

### B. Analysis of the Case at Bar

The judge below charged the jury that the burden of proof as to willfulness was upon the plaintiff to "satisfy and convince you to a reasonable certainty by a preponderance of the evidence that the actions of Milwaukee Boiler were intentional—that is, willful and voluntary as distinguished from conduct that is merely accidental or unknowing." The jury returned a verdict of willful action by Milwaukee Boiler. The trial judge granted the defendant's JNOV motion, pursuant to rule 50(b) of the Federal Rules of Civil Procedure.

The plaintiff-appellant urges on appeal that the trial court's instruction on willfulness set a higher standard than that required by the Act, because it referred to "intentional" behavior, and that the judge below should not have disturbed the jury's finding of willfulness under this elevated standard by granting the rule 50(b) motion. The plaintiff's argument in support of his latter contention is principally that if the jury had sufficient basis to find the employer's justifications for the layoff and refusal

to rehire pretextual, the jury also had sufficient basis for a finding of willfulness.

The standard employed by the trial judge in instructing the jury as to willfulness is less specific than the standard we think the Act requires, see Section III(A), supra. We find, however, on the facts of this case, no possibility of prejudicial error warranting reconsideration in light of the standard we have adopted. First, the jury found in favor of the plaintiff on the proffered instruction. Second, we find that the trial judge did not abuse his discretion in granting the rule 50(b) motion in light of either the standard he applied or that which we deem to be the proper one.

As stated above, an appellate court applies the same standard as the trial court when reviewing the trial judge's ruling on a JNOV motion. C-Suzanne Beauty Salon, Ltd. v. General Insurance Co. of America, 574 F.2d 106, 112 n.10 (2d Cir. 1978). This court, like the trial court, must therefore draw every permissible inference favoring the plaintiff in this case. See Wisconsin Liquor Co. v. Park & Tilford Distillers Corp., 267 F.2d 928, 930 n.1 (7th Cir. 1959). The issue essentially is whether the wholly circumstantial evidence presented in the case at bar can support an inference that the defendant's acts of discrimination were conscious ones. It is not the case, as the plaintiff contends, that because the jury

10. The aspect of this test for willfulness that requires a showing that the employer knew or reasonably should have known that his actions were violative of the ADEA does not put an insurmountable burden on the ADEA plaintiff. The criterion implies that the plaintiff must show two things: (1) that the employer knew or reasonably should have known what the requirements of the ADEA are; and (2) that the employer knew or reasonably should have known that his actions towards the plaintiff were inconsistent with those requirements.

We concur with the reasoning of the Ninth Circuit in Kelly v. American Standard, Inc., 640 F.2d 974, 980 (9th Cir. 1981), that the appropriate standard cannot create an incentive for the employer to remain ignorant of the law. 29 U.S.C. § 627 (1976) requires employers to post notices required by the Secretary of Labor. Pursuant to statutory authority, the Secretary has promulgated a regulation requiring employers to post notices in conspicuous places on

premises advising employees about the application of the Act, 29 C.F.R. § 850.10 (1980). The plaintiff's burden of showing that the employer knew or reasonably should have known what the law required should therefore be easily met.

The determination whether the employer knew or reasonably should have known that his actions toward the plaintiff were inconsistent with the law is a determination left to the jury in the first instance. The showing must clearly be greater than that necessary for the initial finding of ADEA liability. The showing must be sufficient to indicate that the defendant's discrimination was not unconscious. In a disparate treatment case, a finding of willfulness will generally require some direct evidence of discriminatory intent toward the plaintiff or a showing that, at the time of the alleged discriminatory action, the employer was motivated to discriminate or engaged in a pattern of discriminating against older employees.

might reasonably have inferred that Milwaukee Boiler's post-hoc justifications for its actions were pretextual, the evidence necessarily compels the inference that the defendant acted consciously.

Age discrimination resulting from unconscious stereotyping of an older person's abilities violates the ADEA although it may not have occurred with the state of mind necessary to a finding of willfulness. Yet it is likely that an employer will attempt to offer a legitimate reason for its actions at trial to avoid liability in the first instance. Because the defendant's trial explanation is not believed does not mean that its original actions were in fact consciously discriminatory.

Other courts have held that a finding of pretext does not necessarily compel a finding of willful discrimination. For instance, in *Walker v. Pettit Construction Co.*, 605 F.2d 128, 130–31 (4th Cir.), *mod. on other grounds sub nom. Frith v. Eastern Air Lines*, 611 F.2d 950 (4th Cir. 1979), a witness testified that a defendant employee had stated that the management would not consider anyone over thirty-five years of age for top management positions. Finding that the defendant's asserted reason for demoting the plaintiff could have been pretextual, the court upheld a jury verdict of age discrimination but not willfulness. Similarly, in *Kelly v. American Standard, Inc.*, 640 F.2d 974, 981 (9th Cir. 1981), even in the face of discriminatory statements allegedly made by the defendant's employees, the court ruled that the district court could have found unintentional discrimination.

In the case at bar, Syvock was told at the time of layoff that his discharge was due to lack of work. At trial, however, the company also attempted to show that Syvock was laid off and not rehired in part because of his poor production capabilities. The plaintiff disproved, at least, to the jury's satisfaction, Milwaukee Boiler's purported reason of low production through evidence of a few favorable evaluations and the existence of some disparity between his work record and the records of those retained and/or rehired.

The evidence was conflicting and wholly circumstantial. There was no direct evidence that the defendant was aware of the plaintiff's age, let alone that Milwaukee Boiler discriminated against Syvock because of age, which, in this case, was far from bordering on years associated with the possibility of senility. This lack of direct evidence distinguishes this case from two relied upon by the plaintiff. In *Robb v. Chemetron Corp.*, 17 FEP Cases 1535, 1541 (S.D.Tex.1978), "the expressed philosophy of the defendant that the age of management-level employees must be reduced and controlled" contributed to a finding of willfulness. Similarly, the instant case is distinguishable from *Buchholz v. Symons Manufacturing Co.*, 445 F.Supp. 706, 713 (E.D. Wis.1978), where the court found that numerous statements by management employees concerning the plaintiff's age established a willful violation.

Even though Milwaukee Boiler's purported reasons for its actions were not persuasive to the jury, the defendant's showing was not so weak as to allow no room for any conceivable explanation for its actions except age discrimination. This case is therefore unlike *Loeb v. Textron, Inc.*, 17 FEP Cases 1332, 1333 (D.R.I.1978), *vacated and remanded on other grounds*, 600 F.2d 1003 (1st Cir. 1979), in which the court found no reasonable explanation, other than discrimination, for the plaintiff's appointment to oversee a nonexistent market. Similarly, in *Mistretta v. Sandia Corp.*, 21 FEP Cases 1671, 1672 (D.N.M.1978), *aff'd in part, and rev'd and remanded in part on other grounds*, 639 F.2d 588 (10th Cir. 1980), the court found a "lack of objective supportable reasons for selecting particular individuals for layoff other than their age."

Further, the plaintiff produced no evidence that Milwaukee Boiler was engaged in a pattern of replacing its older employees at the time Syvock was laid off. The defendant employs several welders who are older than the plaintiff.

■ Absent any direct evidence of Milwaukee Boiler's intent to discriminate

against the plaintiff or compelling circumstantial evidence, we find the record insufficient to support an inference that the defendant knew or reasonably should have known that its actions towards Syvock were violative of the ADEA. Although the judge below applied a less specific standard than that which we have adopted, we agree with his conclusion that "[t]he evidence . . . was barely sufficient to uphold a verdict of discrimination," and "there is no evidence in this record to sustain a verdict of willfulness."

IV.  Mitigation of Damages

A.  *Admission of Testimony in Alleged Contravention of Pretrial Order*

Syvock claims that he was prejudiced by the trial judge's admitting the testimony of Benson Loomis, an employee of the Wisconsin Job Service, after the plaintiff had rested his case at the bench trial on damages.

The district judge had issued a pretrial order on September 11, 1979, instructing the parties to prepare a joint report detailing the names and addresses of witnesses each planned to call. In the case of expert witnesses, a narrative statement of the expert's background and experience was required. The pretrial order stated that: "It is contemplated that other witnesses will not ordinarily be permitted to be called except upon a showing of surprise." [11] The parties filed a report in response to the order, indicating that they had exchanged lists of prospective witnesses and that neither contemplated calling expert witnesses. Benson Loomis was not included in the defendant's list.

Federal Rule of Civil Procedure 16 indicates that pretrial orders should guide the course of the trial, but the rule itself acknowledges a judge's power to modify such order at trial. The trial judge permitted Loomis to testify, over the plaintiff's objection, indicating that if it appeared the testimony constituted "substantial surprise" to the plaintiff, he would take steps to obviate the problem. After hearing the testimony, the judge apparently perceived no unfairness because he refused to strike it.

Loomis' testimony was probative on the issue of mitigation. The plaintiff had testified at length that he had visited the Wisconsin Job Service several times weekly to check job listings beginning as early as July 1976, and continuing through the entire period of his unemployment. Syvock represented that he had spent approximately six hours per day for four days each week searching for work. He had spoken with an employee other than Loomis. The testimony of Loomis did not contradict the specific interviews alleged to have occurred. His general testimony regarding job availability in Syvock's field during the relevant time period was, however, competent and useful in probing the plausibility of Syvock's contention that although he had vigorously sought employment, he had received no welding job offers from the time of his layoff in May 1976 until December 1977.

The plaintiff contends that Loomis testified as an expert. The defendant alleges that because the testimony was merely based upon information available at the Job Service, it was more comparable to that of a records custodian. The district judge correctly recognized that the witness' testimony lay somewhere in between.

■ We do not need to decide whether the testimony of Loomis was essentially that of an expert because even if Loomis were "to be regarded as [an] undisclosed expert [witness], . . . this court would not interfere with the trial court's determination not to hold the appellee to the pretrial order unless there was a clear abuse of discretion or manifest injustice." *Sadowski v. Bombardier, Ltd.*, 539 F.2d 615, 621 (7th Cir. 1976).

---

11.  While the pretrial order undoubtedly applied to the jury trial on liability, there is some question as to whether the order was intended also to govern the bench trial on damages. We need not resolve this dispute because we are convinced that even if the order extended to the damages phase, the trial judge did not abuse his discretion in modifying the order to admit Loomis' testimony.

Although the expert nature of a surprise witness' testimony may in some cases contribute to a finding of prejudice, this is not such a case. All of the matters that the plaintiff contends could have been clarified by further preparation either were, or could have been, developed sufficiently on cross-examination without advance preparation.[12] For example, knowing that his client had no access to an automobile during the relevant time period, plaintiff's counsel could have vigorously cross-examined Loomis as to whether the job openings he described were concentrated in areas inaccessible to public transportation. Plaintiff's counsel did elicit testimony indicating that the figures Loomis produced spanned the entire four-county Milwaukee metropolitan area. Furthermore, counsel probed at length the possibility that Loomis' statistics might contain some amount of error. Loomis, moreover, admitted that a criminal record could create difficulty in obtaining a job. Finally, Syvock's counsel brought out on cross-examination that Loomis was relying on statistics which included "flame cutters" as well as welders and welder-fitters. Syvock himself had testified that he was qualified to perform welding and fitting tasks which included some flame cutting. To the extent that the statistics utilized by Loomis might nonetheless have been misleading, the discrepancy was developed on cross-examination.

Additionally, we note that the district judge's finding on the mitigation issue was not solely based upon Loomis' testimony, but rested heavily on Syvock's lack of credibility. The court reasoned:

What the plaintiff did, in essence, was take a sabbatical and collect unemployment compensation. An example of this attitude is found in this exchange between Mr. Syvock and his counsel during the trial:

"Q. I see. Did you, in fact, try to get employment as best you could after you were terminated?

A. Yes, not at the very beginning. I told you, I had a vacation coming. I went on vacation, and I was enjoying my lay-off at that time. I considered it a vacation, not a lay-off.

Q. Um hum.

A. In the spring of the year and I thought I'd do a little fishing and I worked ten hours a day at Milwaukee Boiler and sometimes ten hours a Saturday. I had money.

Q. All right.

A. I wasn't in financial need then. So, I was having fun.

Q. Okay."

While the testimony quoted above referred to the period directly following the layoff, the court is convinced that the attitude continued into 1977. This assessment, in part, is based on the court's judging of the credibility of the plaintiff, a task that resulted in a finding bordering on the unfavorable.

■ Although more advance notice of Loomis' testimony might have been preferable, we do not feel that the trial judge's decision not to hold the appellee to the pretrial order constituted an abuse of discretion or created manifest injustice toward the plaintiff.

## B. Burden of Proof

■ In *Wehr v. Burroughs Corp.*, 619 F.2d 276, 278 n.3 (3d Cir. 1980), the Third Circuit ruled that an ADEA defendant has the burden of proving that (1) the plaintiff failed to exercise reasonable diligence to mitigate his damages, and (2) there was a reasonable likelihood that the plaintiff might have found comparable work by exercising reasonable diligence.[13] In the in-

---

**12.** Indeed, the plaintiff asserts that "most if not all of [the] impact [of Loomis' testimony] was destroyed by the impromptu cross-examination," but nonetheless claims prejudice because "the District Court chose to use his testimony as evidence that the Plaintiff did not seek work diligently enough." It thus appears that the plaintiff's complaint is more properly directed to the weight accorded to, not the admissibility of, Loomis' testimony. We find no error in the admission of, or weight accorded to, Loomis' testimony.

**13.** In *EEOC v. Sandia Corp.*, 639 F.2d 600, 627

stant case, while not explicitly articulating this standard, the district court recognized that the defendant bears the burden of proving failure to mitigate damages. Reviewing the record under the ·Wehr standard, we are satisfied that there was sufficient evidence to support the district court's conclusion that the plaintiff failed to mitigate his damages.[14] That finding therefore was not clearly erroneous.

The plaintiff's citation of *NLRB v. Nickey Chevrolet Sales, Inc.*, 493 F.2d 103, 108 (7th Cir. 1974), *cert. denied*, 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60, is inapposite because there the court relied upon (1) the defendant's failure to produce any evidence regarding job availability, and (2) the fact that the examiner did not discredit the employee's testimony. Contrarily, in the case at bar, the judge expressed strong concern about the reliability of Syvock's testimony. This case is also unlike *Sprogis v. United Air Lines, Inc.*, 517 F.2d 387, 392–93 (7th Cir. 1975), a Title VII case, in which the record apparently contained absolutely no evidence tending to show that the plaintiff may not have exercised due diligence in obtaining employment.

## V. Damage Calculations

■ Aside from the mitigation issue, the plaintiff contends that the district court

erred in calculating the overall amount of backpay to which Syvock would otherwise have been entitled. We have reviewed the record in light of the numerous allegations of error regarding the computation of backpay and amounts awarded in addition to, or offset from, the initial liability determination. An award of backpay is within the district judge's discretion, and we find no abuse of that discretion in this case. *Merriweather v. Hercules, Inc.*, 631 F.2d 1161, 1168 (5th Cir. 1980). We will, however, examine the major contentions of the parties.

### A. Lost Earnings Computations

■ The plaintiff first objects to the admission of evidence setting forth the earnings of "Mr. G," a Milwaukee Boiler welder, to establish a benchmark from which to determine Syvock's lost wages. The plaintiff moved the district court to strike admitted testimony relating to "Mr. G" because this employee had not been included on the defendant's lists of welders and pay scales previously requested by the plaintiff. The plaintiff can hardly establish prejudice from this claimed error, however, because "Mr. G" was the highest paid welder in terms of hourly wage both when Syvock was laid off in 1976, and at the time of trial. The district court computed the plaintiff's projected hourly earnings by cal-

(10th Cir. 1980), the Tenth Circuit adopted a substantially similar standard in an ADEA case. We therefore reject the plaintiff's assertion that reduction of an award for failure to mitigate damages is appropriate in ADEA cases only if the defendant can show that the plaintiff actually refused reasonable employment opportunities.

14. Syvock complains that the district judge wrongfully penalized him for voluntarily terminating inferior employment for satisfactory reasons. *See Taylor v. Ford Motor Co.*, 392 F.Supp. 254, 256 (W.D.Mo.1974). He asserts that he quit his first foundry job in 1978 for health reasons, and that he left the second foundry job in 1979 due to the expectation of employment at his current job at a higher rate of pay. Even accepting the plaintiff's proffered reasons as true, however, his allegation is without merit.

In computing lost wages, the court specifically set off Syvock's *actual* earnings for 1978 and 1979 which did *not* include amounts the plaintiff would have earned had he not quit the

foundries. The court's concern for mitigation of damages was not directed at Syvock's 1978 and 1979 voluntary terminations of the foundry jobs, but rather, his lack of diligency in seeking employment soon after his 1976 layoff:

[A] proper cutoff time for a damage assessment in this case should be the day when the wounds of discrimination should have healed.... [I]n this case it is certain that the sting of any discriminatory conduct ended, or should have ended, substantially in advance of the date the trial on damages commenced.

In this case, it is not necessary to determine the date the discrimination effects actually ended because the defendant has convinced the court that at an early date following the layoff the plaintiff failed to use reasonable diligence in seeking employment. What the plaintiff did, in essence, was take a sabbatical and collect unemployment compensation.

culating future increases in his hourly wage rate based upon a comparison to the increases in the rate of "Mr. G." The court then adjusted the total downward by an averaged 12% absenteeism rate,[15] but increased it by figuring in additional wages based upon a 14% overtime rate—a percentage equivalent to the average 1976 overtime rate of Milwaukee Boiler employees which actually was greater than Syvock's own 1976 overtime rate of 8.5%.

The plaintiff would prefer to compare Syvock's lost earnings to the *annual* earnings of two other more senior welders, whose hourly wage was less than "Mr. G's" apparently because these particular employees' earnings over the years were substantially inflated due to numerous overtime hours worked and negligible absenteeism. The plaintiff would have the court blindly apply the annual earnings of these welders to determine Syvock's lost wages without any independent consideration of appropriate overtime and individualized absenteeism rates for the plaintiff. Such an award would truly subvert justice because in 1979, for example, approximately 30% of one of the employee's total hours worked was overtime and he was absent only two days. The other employee Syvock sought to use for comparison had a 44% overtime rate and missed absolutely no work in 1979. It would be wholly inappropriate to reward the plaintiff, and penalize the employer, for the extraordinary diligence and motivation of other workers.

### B.  Pension, Health Insurance, and Vacation Benefits

■ The court correctly added to the total award contributions the employer would have made to the pension fund, *Kelly v. American Standard, Inc.,* 640 F.2d 974, 986 n.20 (9th Cir. 1981); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1021 (1st Cir. 1979). The court refused, however, to include lost health insurance benefits in the award because Syvock had not purchased alternate coverage. *See Buchholz v. Symons Manufacturing Co.,* 445 F.Supp. 706, 713 (E.D. Wis.1978). The inclusion of the cost of health insurance benefits in the award is discretionary with the trial court, and we find no abuse of discretion in this case. *Merriweather v. Hercules, Inc.,* 631 F.2d 1161, 1168 (5th Cir. 1980).[16]

### C.  Unemployment Compensation Offset

■ Syvock next complains that the district court should not have deducted unemployment compensation he received from the backpay award. As the court in *EEOC v. Sandia Corp.,* 639 F.2d 600, 624 (10th Cir. 1980), recognized, some district courts refuse to offset unemployment benefits, reasoning that such compensation is collateral to backpay and is provided by the government to advance wholly distinct policy considerations. Yet, because backpay awards are within the discretion of the district court, many appellate courts decline to find an abuse of discretion when the lower court offsets unemployment compensation from the backpay award. *See id.* at 625. In *EEOC v. Enterprise Association Steamfitters Local No. 638,* 542 F.2d 579, 592 (2d Cir. 1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977), for example, the Second Circuit upheld a district

---

**15.** The plaintiff asserts that this 12% absenteeism rate was based upon erroneous calculations. He contends that while his absence in the first part of 1976 was about 21%, his prior rates of absence for 1974 and 1975 were lower than 12%. He argues that the 12% average was figured by weighting the first 5 months of 1976 too heavily. While pure mathematical calculations might lower the overall absenteeism average somewhat, it is not necessarily erroneous to figure future projected absenteeism by assigning more weight to the defendant's most recent experience with the employ-

ee. We cannot say that the judge erred by assigning a 12% absenteeism rate to the plaintiff based upon his prior work record, particularly since it appears that his backpay was increased by a higher overtime rate than Syvock may have deserved.

**16.** The plaintiff's contention that the district court did not include compensation for lost vacation and holiday benefits is without merit because the district court's computation of Syvock's overall projected annual pay in fact included both of these items.

162

court's deduction of public assistance from a Title VII backpay award reasoning, in part, that "[w]e see no compelling reason for providing the injured party with double recovery for his lost employment; no compelling reason of deterrence or retribution against the responsible party in this case; and we are not in the business of redistributing the wealth beyond the goal of making the victim of discrimination whole." [17] Accordingly, we adhere to the previous position of this circuit as expressed in *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711, 721 (7th Cir. 1969), a Title VII case, that the deduction of unemployment compensation received by the plaintiff was an appropriate exercise of the district court's discretion in this case.[18]

### D. Prejudgment Interest

The district court also declined to award prejudgment interest. Although prejudgment interest may be awarded by the district court, such an award also lies within the trial court's discretion. *Taylor v. Philips Industries, Inc.*, 593 F.2d 783, 787 (7th Cir. 1979) (Title VII).[19] The district court did not abuse its discretion in this case. Here, the court found that there was barely enough evidence on which the plaintiff could prevail, and in fact, found that there was absolutely no evidence of willfulness, while at the same time determining that the plaintiff had not attempted to mitigate damages in a reasonable manner.

### VI. Attorney's Fees

The district court calculated the fees that the plaintiff should receive pursuant to 42

U.S.C. § 1988 (1976) by a two-step analysis. First, the trial judge applied the factors approved by this court in *Waters v. Wisconsin Steel Works of International Harvester Co.*, 502 F.2d 1309, 1322 (7th Cir. 1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). On the basis of this analysis, the court determined that only 200 hours, rather than the 400 plus hours submitted by counsel, should be compensated. Second, relying on *Muscare v. Quinn*, 614 F.2d 577, 580 (7th Cir. 1980), the trial judge held that the number of compensable hours should be further reduced from 200 to 70. This reduction was required, according to the court below, because the plaintiff did not prevail on either the willfulness aspect of his claim or the question of mitigation. The appellant challenges both these bases of reduction and stresses the contingent nature of the fee arrangement to seek a 25% increase in the fee.

The award of attorney's fees is subject to the discretion of the trial court. *Muscare v. Quinn*, 614 F.2d 577, 579–80 (7th Cir. 1980). We find no abuse of discretion in either the lower court's initial reduction of compensable hours to 200 or in its refusal to apply the 25% multiplier. In challenging the district court's reliance on *Muscare*, however, Syvock is attacking the legal basis of the trial court's resolution. Despite the fact that an abuse of discretion standard is applicable on review, we must therefore assess the legal correctness of the district court's ruling. *See Hughes v. Repko*, 578 F.2d 483, 486 (3d Cir. 1978). We hold that

**17.** We are not unmindful that the deduction of unemployment compensation from backpay may provide a "windfall" for the employer who by this manner may avoid payment of a portion of the illegally withheld backpay. *EEOC v. Sandia Corp.*, 639 F.2d 600, 626 (10th Cir. 1980). Yet, failure to offset unemployment benefits similarly provides a windfall for the employee, although the *Sandia* court would answer this objection by reasoning that "unemployment compensation is a purely collateral source and is peculiarly the property of the claimant." *Id.* at 625.

**18.** This result is not inconsistent with *Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730,

736 (5th Cir. 1977), in which the Fifth Circuit affirmed a court's refusal to deduct unemployment benefits from a backpay award in the exercise of its discretion under the ADEA.

**19.** Although we have stressed that Title VII and ADEA cases are not necessarily automatically interchangeable in establishing the existence of discrimination, both Title VII and ADEA vest trial courts with a similar broad discretion in awarding such legal or equitable relief as the courts deem appropriate. *Compare* 42 U.S.C. § 2000e–5(g) (1976) *with* 29 U.S.C. § 626(b) (1976).

the trial court erred in interpreting *Muscare* to require a further reduction of attorney's fees on the facts of this case.

A somewhat detailed examination of *Muscare*, as well as this court's subsequent opinions on the proper method of determining the appropriate fee award pursuant to section 1988, *see Busche v. Burkee*, 649 F.2d 509 (7th Cir. 1981); *Sherkow v. Wisconsin Department of Public Instruction*, 630 F.2d 498, 504–05 (7th Cir. 1980), is in order.[20]

In *Muscare*, the plaintiff sought relief for two independent claims. He claimed that a grooming regulation of the Chicago Fire Department was unconstitutional and sought injunctive relief prohibiting its enforcement. Muscare also claimed that the disciplinary proceedings, to which he was subjected as a result of violating the grooming code and which resulted in his suspension, deprived him of due process. The district court denied relief as to the grooming regulation and did not expressly rule on the procedural due process claim. This court declined to resolve the constitutionality of the grooming regulation but held that Muscare had been suspended without procedural due process. *Muscare v. Quinn*, 520 F.2d 1212 (7th Cir. 1975).

The Supreme Court granted the defendant's petition for a writ of certiorari on July 24, 1975. In August of 1975, the Civil Service Commission of the City of Chicago revised its suspension procedures so as to provide for a pre-suspension hearing for most Chicago civil service employees, including those in the fire department. In light of the revised suspension procedure and the Court's intervening decision in *Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), which upheld a grooming regulation similar to that challenged in *Muscare*, the Supreme Court dismissed the writ of certiorari on May 3, 1976, as improvidently granted.

The district court entered judgment for Muscare on the procedural due process claim on December 6, 1976. Subsequently, the court granted his motion for costs and attorney's fees, although the fees granted were less than those requested. Both the plaintiff and defendant appealed the grant of attorney's fees.

In resolving the attorney fee issue, this court stated:

This Court's first opinion in *Quinn* was left standing to the effect that there had been a denial of procedural due process. Accordingly, attorney's fees should only be awarded on plaintiff's successful claim that he was denied due process and not on his unsuccessful claim that the Fire Department's grooming regulation was unconstitutional. *Dillon v. AFBIC Development Corp.*, 597 F.2d 556, 564 (5th Cir. 1979); *Equal Employment Opportunity v. Safeway Stores*, 597 F.2d 251, 253 (10th Cir. 1979) . . .; *Hughes v. Repko*, 578 F.2d 483, 487 (3d Cir. 1978).

614 F.2d at 580. The judgment as to fees was therefore vacated and remanded to the district court to determine and award a fee for the claim upon which Muscare prevailed.

Unlike Muscare, Syvock has presented only one claim: that Milwaukee Boiler discriminated against him because of age. Syvock prevailed on this claim and therefore is entitled to his reasonable attorney's fees pursuant to 42 U.S.C. § 1988 (1976).

*Hughes v. Repko*, 578 F.2d 483 (3d Cir. 1978), on which this court relied in *Muscare*, is helpful in determining the applicability of the *Muscare* rule to the case at bar. In *Hughes*, the plaintiffs asserted two claims, one pursuant to 42 U.S.C. § 1982 (1976) and one pursuant to 42 U.S.C. § 1985 (1976), against each of two defendants. The court directed verdicts against the plaintiffs on the section 1985 claim as to both defendants and as to one of the two defendants on the section 1982 claim. The jury awarded the plaintiffs damages against the other defendant, Mrs. Repko, on the section 1982 claim. The plaintiffs were not, however,

---

20. The award of attorney's fees was also at issue in *Bonner v. Coughlin*, 657 F.2d 931 (1981). That opinion, however, relied on factors other than those central to the application of the *Muscare* rule.

awarded punitive damages. Further, they lost on their contention that the attorney's fee issue was one for the jury. The district court reduced the award by about two-thirds because the defendants prevailed on those two questions.

The Third Circuit court found that this automatic reduction was legally impermissible. 578 F.2d at 486. It held that:

> a prevailing party on a particular claim is one who fairly can be found by the district court to have essentially succeeded on such claim, as "claim" is used in Fed.R. Civ.P. 10(b). We say "essentially succeeded" because in many cases a party may prevail on his basic claim but not on all aspects thereof. Given the spirit and purpose of the statute, we think our test allows the district courts to meet their obligations under the Act. Thus, we believe that plaintiffs here essentially prevailed on their § 1982 claim against Mrs. Repko, even though they were denied punitive damages and even though their request that the attorney's fee question be decided by the jury was rejected.

578 F.2d at 487.

Just as the plaintiffs Hughes "essentially succeeded" in their section 1982 claim against Mrs. Repko, plaintiff Syvock "essentially succeeded" in his ADEA suit against Milwaukee Boiler. Syvock's failure to prevail on the questions of willfulness and mitigation of damages should no more diminish his award than did the Hughes' failure to succeed on the punitive damage issue or their contention that the attorney's fees issue was a jury question.[21]

Cases decided by this court subsequent to Muscare are consistent with the above analysis of that case's rule. In Sherkow v. Wisconsin Department of Public Instruction, 630 F.2d 498 (7th Cir. 1980), the plaintiff "essentially succeeded" on her Title VII claim.[22] The findings of the trial court that the defendant both had discriminated against the plaintiff on the basis of sex by denying her a promotion for which she was qualified and had subsequently unlawfully retaliated against her because she publicly asserted her right to be free from discrimination were affirmed on appeal. Writing for a panel of this court, Judge Baker stated that "[o]nce the court has determined that the plaintiff has prevailed then the plaintiff is entitled to recover for all the time reasonably spent on a matter." 630 F.2d at 504.

Although the Sherkow opinion does not refer to the Muscare case decided six months earlier by this court, the two cases are consistent. In each, the award of attorney's fees was allowed insofar as it represented work devoted to those claims on which the plaintiff essentially succeeded.

Less than a year after the decision in Sherkow, this court again considered the appropriate calculation of attorney's fees when the plaintiff has prevailed on some but not all of his claims. In Busche v. Burkee, 649 F.2d 509 (7th Cir. 1981), the plaintiff had alleged that Burkee and seven others had violated his rights under the due process clause of the fourteenth amendment. By stipulation, all defendants other than Bosman, the Kenosha Chief of Police, and Burkee, the former mayor of Kenosha, were dismissed from the action. Busche asserted three claims against the defendants: that the charges filed against him before the Commission were constitutionally insufficient, that the Commission's written findings and conclusions were constitutionally deficient, and that his termination was unlawful because he was afforded no pre-termination hearing. Busche prevailed on only the third allegation. Further, the

---

21. The Fifth and Tenth Circuit cases on which Muscare also relied, Dillon v. AFBIC Development Corp., 598 F.2d 556 (5th Cir. 1979), and Equal Employment Opportunity v. Safeway Stores, 597 F.2d 251 (10th Cir. 1979), are similarly consistent with this interpretation of Muscare.

22. The Sherkow opinion is not specific as to on what, if any, aspect of her claim the plaintiff failed to prevail at the district court level. On appeal, this court affirmed the judgment except as to the trial judge's ruling on how the State Superintendent was to expunge a critical evaluation from Dr. Sherkow's personnel file. 630 F.2d at 504–05.

district court dismissed Bosman as a defendant because it found that he had acted merely as an agent of Burkee. *Busche v. Burkee*, 474 F.Supp. 484 (E.D.Wis.1979). This court affirmed those aspects of the district court's determination. 649 F.2d at 522.

In calculating the award of attorney's fees pursuant to 42 U.S.C. § 1988 (1976), the district court had relied on *Northcross v. Board of Education of Memphis*, 611 F.2d 624, 636 (6th Cir. 1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980). After quoting the broad language of *Northcross*,[23] this court stated:

> Although the rule announced in *Northcross* may have considerable merit, it seems at odds with the formulation adopted by this court in *Muscare v. Quinn*, 614 F.2d 577, 578–79 (7th Cir. 1980), which held, in part on the authority of *Hughes*, that attorney's fees should be awarded under § 1988 only for preparation and presentation of the claims on which a plaintiff is determined to have prevailed.

649 F.2d at 522. The case was therefore remanded to the district court on the attorney fee question, for consideration in light of *Muscare*.

Although the *Busche* opinion did not discuss the decision in *Sherkow*, which had also relied on *Northcross*, the remand in *Busche* is consistent with the disposition in *Sherkow*. Plaintiff Busche had alleged three separate violations of his due process rights. He prevailed on only one. Plaintiff Sherkow had alleged unlawful discrimination by virtue of the defendant's failure to promote her and its subsequent retaliation against her. In contrast to *Busche*, Dr. Sherkow prevailed on both these claims.

The resolution in *Busche* is similarly consistent with our analysis of the *Muscare* rule in this case. Plaintiff Syvock has presented one claim of age discrimination. He has "essentially succeeded." His failure to persuade the court that he mitigated his damages or that the defendant acted willfully indeed decreased his damage award. Syvock's failure to prevail on these elements of his claim, however, did not alter the finding of liability against the defendant. Busche, on the other hand, contended that his due process rights were violated by three different actions by the defendant at the time of his termination. The two on which he failed to prevail were not mere *aspects* of a larger claim that affected the amount of damages he was due for the claim on which he did succeed. They were independent claims, as was the challenge to the constitutionality of the grooming regulation in *Muscare*, on which he did not succeed.

Because the district court erroneously reduced Syvock's award of attorney's fees because of his failure to succeed on the willfulness and mitigation questions, we vacate that portion of the lower court's opinion. The case is remanded to the district court with directions to enter an order for attorney's fees in the amount of $11,000 (200 hours at $55 per hour) which is in accordance with this opinion. All other aspects of the District Court's opinion are affirmed. The parties shall bear their own costs.

**23.** The Sixth Circuit in *Northcross* stated: "So long as the party has prevailed on the case as a whole the district courts are to allow compensation for hours expended on unsuccessful research or litigation unless the positions asserted are in bad faith." 611 F.2d at 636, *quoted in Busche v. Burkee*, 649 F.2d 509, 522 (7th Cir. 1981). Despite this language which, on its face, might be interpreted to require a result inconsistent with *Muscare*, *Northcross* and *Muscare* can be reconciled on their facts. In *Northcross*, the district court had found that the plaintiffs had prevailed on both their claims. The district court reduced the fees however because the plaintiffs had not prevailed on some " 'issues or parts of issues' ", 611 F.2d at 635. The second claim in *Northcross*, which is the more pertinent to understanding that case in light of *Muscare*, advocated a broader desegregation remedy than that which was adopted. The Sixth Circuit held that this discrepancy in the scope of the remedy was not a permissible basis for reducing the fee award. *Id.* at 636. *Northcross* did not involve any claim on which the plaintiffs *failed to prevail* as Muscare failed in his challenge to the grooming regulation.