GRAND BOULEVARD IMPROVEMENT
ASSOCIATION, et al., Plaintiffs,

v.

CITY OF CHICAGO, et al., Defendants.

Alice B. COLEMAN, et al., Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOP-
MENT, et al., Defendants.

Nos. 81 C 1284, 80 C 4760.

United States District Court,
N.D. Illinois, E.D.

Sept. 7, 1982.

Anthony J. Fusco, Jr., Richard Hess, Sara E. Johnson, Gordon Waldron, Legal Assistance Foundation of Chicago, Thomas Hoidal, Julielynne Walker, Legal Assistance Foundation Mid-South Legal Services, John Bouman, Patricia Winfrey, Legal Assistance Foundation-Englewood Legal Services, Chicago, Ill., for plaintiffs.

Michael W. Smith, Chicago, Ill., for individual plaintiffs-intervenors.

Daniel Radakovitch, Chicago, Ill., for plaintiff-intervenor Prayer Bank Pentecostal Church.

Earl Neal, Stanley Garber, Kathleen Randford, Kenneth J. Cortesi, Chicago, Ill., for city defendants.

Alan S. Ganz, Christine M. Wheelock, Rooks, Pills, Fullagar & Poust and Jeffrey Jahns, Roan & Grossman, Chicago, Ill., for state defendants.

Dan K. Webb, U.S. Atty., Gail C. Ginsberg, Asst. U.S. Atty., Chicago, Ill., for federal defendants.

James G. Lemon, Jr., Chicago, Ill., for private defendants.

William Ratner, Levy & Erens, Chicago, Ill., for defendant South Shore Beach Associates.

## MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

In these two separate actions plaintiffs, having successfully challenged certain administrative actions by the Department of Housing and Urban Development ("HUD"), have moved for an award of attorney's fees against the federal government under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504, 28 U.S.C. § 2412(d) (Supp. IV 1980). While the cases raised separate issues on the merits, the attorney's fees motions come to us at the same time and raise similar questions under the EAJA. In addition, the plaintiffs in both cases are represented by the Legal Assistance Foundation of Chicago and the federal defendant is represented by the same Assistant United States Attorney. Not surprisingly, then, the briefs submitted by the parties in each case are practically identical, with the exception of application of the disputed legal standards to the distinct factual situations. We have consolidated the cases for purposes of our decision on the attorney's fees question.

In *Grand Boulevard,* we awarded plaintiffs partial summary judgment and enjoined HUD from releasing funds to the City of Chicago for the proposed Paul G. Stewart Phase IV ("Phase IV") housing project "until the City explores the feasibility of modifications of the Phase IV plan

which will preserve existing housing and avoid permanent displacement of neighborhood residents." No. 80 C 4760, slip op. at 40 (N.D.Ill. October 14, 1981). In *Coleman* we found that HUD's decision to sell the South Shore Beach Apartments ("South Shore") was lawful but held that "to the extent that the sale does not provide for a twenty year restriction against conversion of the building to a condominium or cooperative without HUD's prior approval, and to the extent the contract of sale sets aside only seven units of housing to be set aside for non-elderly tenants eligible for § 8 assistance, the sale is set aside and HUD is enjoined from proceeding with it." No. 81 C 1284, slip op. at 29 (N.D.Ill. January 11, 1982). Both sets of plaintiffs now seek to invoke the Equal Access to Justice Act in support of their motions to obtain attorney's fees from the United States.

The EAJA became effective October 1, 1981. The amount of litigation already decided under the Act is testimony to the fact that rarely will lawyers move more swiftly or adroitly than where questions of attorney's fees are at issue. The government for its part is attempting to protect its purse strings by consistently arguing, so far unsuccessfully, that the Act cannot possibly mean what it says. These cases present us with several questions of importance under the EAJA; we treat them in turn.

■ The government's first line of defense is that an award of fees in both of these cases is barred by the doctrine of sovereign immunity. There is no dispute that Congress waived sovereign immunity in enacting the EAJA. The whole purpose of the statute was to make attorney's fees available against the government where private litigants successfully challenged or defended against agency actions. *See gen-*

*erally* H.Rep. No. 1418, 96th Cong., 2d Sess., 8–13 (1980) *reprinted in* [1980] U.S.Code & Admin.News 4984, 4986–92. In its statement of findings Congress declared the Act necessary to offset the high cost of litigation which frequently deterred private parties from seeking review of unreasonable agency actions, and to subject the government to fees under a standard even more beneficial to a prevailing party than embodied in the "American rule" regarding awarding of fees. *See infra* at 1160–1161. Accordingly, the government does not deny that the statute is an express waiver of sovereign immunity. The question raised is simply one of timing: when does the waiver take effect?

■ The EAJA was passed on October 4, 1980 and implemented according to the following provision:

> [This section] shall take effect on October 1, 1981 and shall apply to any adversary adjudication . . . and any civil action . . . which is pending on, or commenced on or after, such date.

5 U.S.C. § 554 note. The government's contention is that while the Act clearly covers cases pending on October 1, 1981, it only applies to that portion of legal work done after October 1, 1981. The argument is predicated in large measure on the generalization that waivers of sovereign immunity must be expressed and cannot be implied. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). But, unlike the cases cited, we are not asked here to construe an otherwise ambiguous statute and infer a consent to be sued on the part of Congress.[1] The general prohibi-

---

1. In *Mitchell* the court refused to infer a consent to be sued on the part of the government in the Indian Claims Commission Act, 28 U.S.C. § 1505 (1976) merely by virtue of the fact that the government assumed a trust relationship in managing certain lands and property interests owned by the Indians. *See* 445 U.S. at 542–546, 100 S.Ct. at 1353–1355. In *Testan,* the court held that the Tucker Act, 28

U.S.C. § 1491 (1976), creating the Court of Claims, was merely jurisdictional and created no substantive rights constituting a waiver of sovereign immunity in particular cases, 424 U.S. at 397–98, 96 S.Ct. at 952–53, and that the Classification Act, 5 U.S.C. §§ 5101–5115 (1976) could not be read to imply a consent to be sued for backpay. *Id.* at 399–406, 96 S.Ct. at 953–957. In neither case was the Court

tion against awarding fees and costs against the federal government, embodied in 24 U.S.C. § 2412 (1976), *see Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), was abrogated by the EAJA. *See Commissioners of Highways v. United States,* 681 F.2d 821 (7th Cir.1982) ("The Act constitutes a significant relaxation of sovereign immunity in actions seeking attorneys' fees from the United States.") Indeed, in one of the cases cited by the government for the general proposition that the United States is immune from an award of fees absent an express waiver, *Knights of the Ku Klux Klan v. East Baton Rouge Parish School Board,* 643 F.2d 1034 (5th Cir.1981), the Supreme Court granted a petition for certiorari, vacated the judgment summarily and remanded for reconsideration in light of the EAJA, *East Baton Rouge Parish School Board v. Knights of the Ku Klux Klan,* 454 U.S. 1075, 102 S.Ct. 626, 70 L.Ed.2d 609 (1982). Despite the fact that all of the legal work was done on the case prior to October 1, 1981, on remand the Fifth Circuit held the case was "pending" within the meaning of the statute and remanded to the district court for determination of whether plaintiffs were otherwise qualified for an award of fees. *See Knights of the Ku Klux Klan v. East Baton Rouge Parish School Board,* 679 F.2d 64 at 67–68 (Former 5th Cir.1982).[2] Neither the Supreme Court nor the Fifth Circuit expressed any reservations about the scope of the waiver contained in the EAJA.

 In any question of statutory construction, no less in questions of sovereign immunity, we must begin with the language of the statute itself. Absent an indication to the contrary in the legislative history, the plain language of the statute governs our interpretation. *See Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Aaron v. SEC,* 446

U.S. 680, 700, 100 S.Ct. 1945, 1957, 64 L.Ed.2d 611 (1980); *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348, 350 (D.D.C.1982). There is nothing ambiguous about the language of the EAJA—the statute applies as of October 1, 1981 to qualifying cases "pending on, or commenced on or after, such date." The government's argument would have us read into the statute a qualification (applying the statute to pending cases, but only for that portion of the work done after October 1, 1981) which simply does not exist. As another court said in response to the same argument:

> The plain meaning of the EAJA is contrary to the Secretary's argument. The EAJA explicitly waives sovereign immunity with regard to a civil action or adversary adjudication pending on October 1, 1981. The Secretary's argument requires an exception to be read into the effective date provision, and this the court cannot do. The civil action before this court was pending on October 1, 1981. This effective date provides *no* barrier to an award of fees and expenses which might have occurred before October 1, 1981. Congress limited the applicability of the EAJA to cases *pending on* October 1, 1981. If it had intended to further narrow the number of applicable cases in this "pending" status, it could have done so by restricting potential cost and fee awards to those incurred *after* the effective date.

*Wolverton v. Schweiker,* 533 F.Supp. 420, 423 (D.Idaho 1982) (emphasis original); *Accord Photo Data, Inc. v. Sawyer,* 533 F.Supp. 348 (D.D.C.1982); *see also Heydt v. Citizens State Bank,* 668 F.2d 444 (8th Cir. 1982) (applying EAJA to pre-October, 1981 services, but finding government's position substantially justified); *WATCH v. Harris,* 535 F.Supp. 9 (D.Conn.1981) (awarding fees for pre-effective date services); *Spang v.*

---

confronted with a statute, such as the one in the case at bar, which contains an express waiver of sovereign immunity.

**2.** The remand to the district court was for the purpose of determining whether the KKK falls

within the financial eligibility limitations of the statute, 28 U.S.C. § 2412(d)(2)(B), and for consideration of whether the government's position was "substantially justified." *Id.,* 679 F.2d at 68.

*United States,* 533 F.Supp. 220 (W.D.Okl. 1982) (same); *Berman v. Schweiker,* 531 F.Supp. 1149 (N.D.Ill.1982) (same); *Underwood v. Pierce,* 547 F.Supp. 256, 260–261 (C.D.Cal.1982) (same).[3]

**3.** Defendant contends that we should reject plaintiffs' claim for pre-effective date services on the basis of the "three-part rationale" advanced by the Court of Claims in *Brookfield Construction Co. v. United States,* 661 F.2d 159 (Ct.Cl.1981). In *Brookfield* the court held that the Contract Disputes Act, 41 U.S.C. §§ 601– 613 did not permit an award of pre-effective date interest. After canvassing the language of the statute the court stated that the provision permitting awards of interest "has a definite aura of ambiguity and is not 'plain' on its face in plaintiff's favor." 661 F.2d at 163. The ambiguity was resolved against permitting pre-Act interest because such awards were contrary to purposes of the Act and would impose a large liability not anticipated when the Act was passed. *Id.* at 163–166.

The short answer to defendant's argument is that the EAJA contains no such ambiguity in its language. Moreover, even if we were to follow the approach outlined in *Brookfield* our discussion *infra* indicates that an award of attorney's fees in the case as a whole rather than a portion of a case does further the policies embodied in the EAJA and does not impose unanticipated liability on the government. *Contra Allen v. United States,* 547 F.Supp. 357 (N.D.Ill.1982). In sharp contrast to the Contract Disputes Act, where the Congressional Budget Office concluded that "it appears that no additional cost to the government would be incurred as a result of enactment of this bill", *Brookfield,* 661 F.2d at 164 & n. 10, *quoting* S.Rep. 95–1118, 95th Cong., 2d Sess., *reprinted in* [1978] U.S.Code Cong. & Admin.News 5235, 5270, the CBO estimated a first year cost under the EAJA of close to $100 million. *See* n. 6, *infra.*

**4.** In *Commodity Futures Trading Commission v. Rosenthal & Co.,* 537 F.Supp. 1094 (N.D.Ill. 1982), Judge Shadur of this court expressed the view in dicta that while the reading we give the statute is a reasonable one, it is not the only one. According to Judge Shadur the interpretation we adopt

could be reached if the effective date provision contained only its last clause, the one stating the Act "shall apply to ... any civil action ... pending on" October 1, 1981. It thus might be said to treat the *earlier* clause ("This Title and the amendments made by this Title ... shall take effect on October 1, 1981 ...") as surplusage. Under familiar rules of construction statutes are to be read, if possible, to give meaning to all their provisions. [citation omitted] And one rational

Defendants have cited nothing in the legislative history of the EAJA to cause us to depart from the plain meaning of the statute.[4] But HUD contends that the purpose of the statute will not be furthered by an

reading of the "take effect" clause would be to apply it to the "fees ... incurred" language of the Act, so that the allowance would extend only to "fees ... incurred" after the Act "shall take effect on October 1, 1981."

*Id.* at 1096 (emphasis original).

We doubt whether Congress can reasonably be said to have intended that the language of the Act be parsed with such detail; the courts in *Wolverton* and *Photo Data* were satisfied that the language says that the Act shall apply to pending cases and contains no qualifications. But even if it is appropriate to engage in such an analysis, the reasoning in *Rosenthal & Co.* is deficient in two respects.

The solution identified by Judge Shadur does not correct the problem addressed; it simply renders the second clause of the effective date provision surplusage. If Congress had intended the Act only to apply prospectively it could have simply stated the Act was to "take effect" October 1, 1981 and apply to fees incurred after that time. There is no need whatsoever to include the "pending case" language; such cases would naturally be included for that percentage of the fees incurred after October 1. Thus, the reading suggested does not give effect to all sections of the statute, it simply makes a choice about what language to ignore.

But there is an alternative reason for including both phrases which is consistent with the result we reach here and was recognized in *Underwood v. Pierce, supra,* at 260:

In *Bradley v. School Board of City of Richmond,* [416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1973)], the Supreme Court approved an award of attorneys' fees for work performed before the effective date of the Educational Acts Amendments of 1972, 20 U.S.C. § 1617, which provided for fees in connection with school desegregation cases. Again, in *Hutto v. Finney,* 437 U.S. 678 [98 S.Ct. 2565, 57 L.Ed.2d 522] (1978), the Court approved attorneys' fees awarded for work done before the effective date of the Civil Rights Attorney's Fees Awards Act. *See also Corpus v. Estelle,* 605 F.2d 175, 179 n. 8 (5th Cir.1979), cert. denied, 445 U.S. 919, 100 S.Ct. 1284, 63 L.Ed.2d 605 (1980); *David v. Travisono,* 621 F.2d 464 (1st Cir.1980). Because the attorneys' fees statutes involved in those cases and the Equal Access to Justice Act address similar concerns, this court concludes that the rationale of [those cases] applies here and the [plaintiff], if eligible to receive fees, is entitled to be compensated for all work done on the instant litigation.

# 1160

award of pre-effective date fees and argues that the cost estimates and budget allocations under the Act indicate that awarding such fees was not contemplated by Congress. Neither argument is persuasive.

■ The legislative history of the statute provides ample support for applying the waiver to pre-effective date legal work. One of the principal purposes of the Act was to permit an award of fees under the common benefit or common fund approach which was not previously available to litigants against the government, *see* 28 U.S.C. § 2412(b), *see also Alyeska Pipeline v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); H.Rep. No. 1418 at 6, *reprinted in* [1980] *U.S.Code Cong. & Admin.News* 4984, 4985 (expressing intent to partially overrule *Alyeska Pipeline*). The House Report indicates that

> [t]he bill rests on the premise that a party who chooses to litigate an issue against the Government is not only representing his or her own vested interest but is also refining and formulating public policy.... The bill [ ] recognizes that the expense of correcting error on the part of

The EAJA has more in common with the statute construed in *Bradley* and *Hutto* than its general purpose. In *Bradley* the Court held that the attorney's fees provision applied to pre-effective date services even though the statute said nothing about whether the Act covered pending cases. *See* 416 U.S. at 710–21, 94 S.Ct. at 2015–21. Thus, simply giving the Act an effective date might not, as Judge Shadur suggested, answer the question whether it applied to services performed before that date. In *Hutto,* however, the legislative history attempted to make clear that "in accordance with applicable decisions of the Supreme Court, the bill is intended to apply to all cases pending on the date of enactment...." *Hutto v. Finney,* 437 U.S. 695 n. 23, 98 S.Ct. 2575 n. 23. In light of that language the Court awarded fees for the entirety of the pending case. In light of the presumption that Congress is familiar with pertinent case law, which is more than justified in this instance given the repeated references in the legislative history of the EAJA to the Civil Rights Act's attorney's fees statute, it would appear that Congress followed its effective date provision with the "pending case" language precisely to avoid the problem addressed in *Bradley* and place expressly in the statute what was only in the legislative history of § 1988 of the Civil Rights Act as interpreted

the Government should not rest wholly on the party whose willingness to litigate or adjudicate has helped to define the limits of Federal authority. Where parties are serving a public purpose, it is unfair to ask them to finance through their tax dollars unreasonable Government action and also bear the costs of vindicating their rights.

*Id.* at 10, U.S.Code Cong. & Admin.News at 4988–89. *See also* House Conf.Rep. No. 96–1434, 96th Cong., 2d Sess. 25 (1980) *reprinted in* [1980] *U.S.Code Cong. & Admin.News,* 5003, 5014. Thus, construing the statute to require a party to bear its own fees where the case is clearly pending on the Act's effective date and the government's position is found to be unreasonable is contrary to the purpose, as well as the plain language, of the statute. *Accord Photo Data, Inc. v. Sawyer,* 533 F.Supp. at 351; *Underwood v. Pierce,* at 261 n. 7.[5]

Finally, the cost analysis relied on by the defendant actually supports the result we reach here. The Congressional Budget Office (CBO) cost estimates are based on the number of *cases* likely to be decided adversely to the government during each fis-

in *Hutto. Accord Underwood v. Pierce,* slip op. at 16–17 n. 7. This view is confirmed by the House Report: "Section 7 makes the effective date of the Act and amendments October 1, 1981. *It clarifies* that it shall apply to ... civil action pending on, or commenced on or after, such date." H.Rep. 96–1418, supra at 19, 4998–99 (emphasis added).

**5.** HUD contends that because a primary purpose of the EAJA was to reduce the deterrence *to contesting* unreasonable actions by the government posed by the expense of litigation, *see* H.Rep. 96–1418, *supra* at 5–6, 4984-85, it follows that fees were not intended for work performed prior to the Act's effective date, since such work was not "encouraged" by the waiver of sovereign immunity. The argument, however, proves too much. If Congress had desired to waive sovereign immunity only for those cases initiated with the hope of recovering fees, it would have limited the waiver to cases *initiated* after October 1, 1981. Instead, it chose to expressly include cases pending on that date, regardless of when they were initiated, despite the fact that all such pending cases were brought, by definition, prior to the passage of the Act—many before it was even drafted.

cal year and the average cost to the government of a reasonable attorney's fee in each *case.* The increase in costs estimated for the second and third year of the program is designed to accommodate the fact that each year the number of cases involving the government has increased slightly, thus the number of adverse decisions, it is assumed, will increase proportionally. *See* H.Rep. No. 1418, *supra* at 21, 22, U.S.Code Cong. & Admin.News at 5000, 5001.[6] Moreover, the CBO cost estimate assumes that the Act will achieve its intended effect of reducing the deterrence to challenging the government with the result that the number of cases brought will increase, and includes a slight increase in the size of the estimated average award to account for changes in the consumer price index. *Id.* at 22–23, *U.S.Code Cong. & Admin.News* at 5001–02. There is absolutely no justification for reading the cost estimates as anticipating a bifurcation of fees depending on whether work in a pending case was performed before or after October 1, 1981.

█ In light of the plain language of the statute and the history which supports it, we conclude that the EAJA constitutes a waiver of sovereign immunity by the government in cases pending on October 1, 1981, for attorney's fees incurred both before and after the effective date of the Act.

The government's second defense is that its position was "substantially justified." Under the standards set out in the EAJA a "prevailing party" in a civil action against the United States is entitled to fees "unless the Court finds the position of the United States was substantially justified." 28 U.S.C. § 2412(d)(1)(A) (Supp.IV 1980). As we pointed out in a prior opinion "[t]he standard created by this statute is a new one, not in line with either the common law exceptions to the American rule restricting the award of attorneys' fees, or other statutory standards allowing fee awards in cer-

tain cases against the United States. It was intended to serve as a 'middle ground' between an automatic award of fees to a [prevailing] party and permitting fees only where the government's position was arbitrary or frivolous." *Berman v. Schweiker,* 531 F.Supp. at 1153–54; *see* H.Rep. No. 1418, *supra* at 14, U.S.Code Cong. & Admin. News at 4993. The legislative history makes clear that a determination that the United States was "substantially justified" is tied to the reasonableness of the government's position. *See id.* at 10, 14, 18, U.S. Code Cong. & Admin.News at 4989, 4993, 4997; H.Conf.Rep. 96–1434, *supra* at 22, U.S.Code Cong. & Admin.News at 5011.

The parties disagree over whether the "position" of the government referred to in the statute is the underlying agency action or the litigation position of the government's attorneys. The case authority to date is divided on this question and the legislative history supports both positions. Two decisions have construed the "position" of the government to refer to the litigation strategy and arguments. *See Citizens Coalition for Block Grant Compliance v. City of Euclid,* 537 F.Supp. 422, 426 (N.D.Ohio 1982); *Alspach v. District Director of Internal Revenue,* 527 F.Supp. 225, 228 (D.Md. 1982). In *Citizens Coalition,* however, the court chose to analyze the litigation position "only to the extent that when as here there has been no trial on the merits and no admission of fault in the consent decree or otherwise, the court must examine the reasonableness of the government's litigation position [because] it generally has insufficient information to determine the reasonableness of the government's underlying action." 537 F.Supp. at 426. To the contrary is *Photo Data v. Sawyer,* 533 F.Supp. at 352, where the court held that unreasonable government conduct which led to the litigation in the first place precluded a finding that the government's position was substantially justified.

**6.** The cost estimates were $92 million for 1982, $109 million for 1983, and $129 million for 1984. *See* H.Rep. 96–1418, *supra* at 21, 5000. It should be noted that the Office of Management and Budget ("OMB") provided a substantially higher cost estimate for the initial year—

$205 million. The difference is attributable to "OMB's assumptions of higher awards, substantial increases in cases terminated resulting from enactment of this bill, and an assumption that additional litigating personnel would be required by the government." *Id.* at 24, 5003.

No doubt in many cases arguing whether to scrutinize the agency action or the litigation position makes a mountain out of a molehill. As the court in *Citizens Coalition* pointed out, "[T]he two positions are closely related (i.e. to defend an unreasonable action in court may itself be an unreasonable action), and the distinction may often be academic." 537 F.Supp. at 426. But where, as in the instant cases, our review on the merits of the controversy was controlled by the standards set out in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1976), the difference may be important. Under the narrow standard of review established by the APA for cases such as these, an agency action may only be set aside where it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Grand Boulevard Improvement Assoc. v. City of Chicago,* slip op. at 8–10; *Coleman v. HUD,* slip op. at 10–13. Where the plaintiffs have succeeded in challenging agency conduct under that narrow standard of review, they have already demonstrated that the underlying position of the government was unreasonable. It would be too much for the English language to bear to say that a position can be arbitrary, capricious, or an abuse of discretion but nevertheless "reasonable." Thus, if we were to look solely at the reasonableness of the underlying action, a reversal under the standards of § 706(2)(A) would appear to negate the need to further inquire into the reasonableness of the government's "position."

■ The statute, however, appears to contemplate further review of the government's "position" after a finding for the private party. While there is support in the legislative history for focusing on the underlying action,[7] the bulk of the commentary suggests we examine the decision of the government to litigate and the reasonableness of the position advanced before the court.

> [The standard] presses the agency to address the problem of abusive and harassing regulatory practices. It is intended to caution agencies to carefully evaluate their case and not to pursue those which are weak or tenuous. At the same time, the language of the section protects the government when its case, though not prevailing, has a reasonable basis in law and fact. Furthermore, it provides a safety valve where unusual circumstances dictate that the government is advancing in good faith a credible, though novel, rule of law.

H.Rep. No. 1418, *supra* 14, U.S.Code Cong. & Admin.News at 4993.[8] Moreover, while the burden of establishing a substantial justification is clearly on the government where the private party has prevailed, *see id.* at 10–11, U.S.Code Cong. & Admin.News at 4989, it is also true that "[t]he standard ... should not be read to raise a presumption that the Government position was not substantially justified, simply because it lost the case. Nor, in fact, does the standard require the Government to establish that its decision to litigate was based on a substantial probability of prevailing." *Id.* at 11, U.S.Code Cong. & Admin.News at 4990.

---

**7.** At several points the Committee reports refer to the government or agency "action" which suggests a focus on the underlying agency conduct. *See* H.Rep. 96–1418, *supra* at 5, 9, 10, 18, 4984, 4987, 4988, 4997. There are two explanations for this. First, the report seems to use the term "action" interchangeably to refer to agency conduct and the litigation position in a civil case, *see id.* at 9, 4987 ("In cases of civil actions brought by or against the United States ...") and 18, 4997 ("Under subsection 2412(d)(1)(A) a party other than the United States who prevails in certain civil actions ..."). Second, as we point out above, particularly where describing the standard in 5 U.S.C.

§ 504, relating to agency awards of fees in enforcement proceedings, the agency's underlying action and its litigation position are one in the same. *See Alspach,* 527 F.Supp. at 228.

**8.** While this description is contained in the section applying to the standard for "adversary adjudications" under 5 U.S.C. § 504, it also applies to cases decided pursuant to § 2412(d). *See* H.Rep. 96–1418, *supra* 18, 4997 ("The same standard which is applied in adversary adjudications under Section 3(a) of this bill, is also applied to fee awards in civil actions under this subsection.").

■ This focus on the "case" and "decision to litigate" is consistent with the general purpose of the statute to conform the responsibility of the government to that of private parties under the common law exceptions to the no attorney's fees rule, *see* § 2412(b),[9] and the citation to Fed.R.Civ.P. 37 (fees to be awarded to a prevailing party on motion to compel discovery unless losing party's position is "substantially justified"), *see* H.Rep. No. 1418, *supra* at 18, U.S.Code Cong. & Admin.News at 4997. Both of those standards, to which § 2412(d) is compared, focus on the litigation position of the losing party, not their position in their underlying, challenged conduct.[10] This does not mean that the reasonableness of the agency position which underlies the litigation is irrelevant. As the district court in *Alspach* pointed out, there may be many cases where the "Government action in administrative or judicial enforcement proceedings . . . *is* the litigation posture." *Alspach,* 527 F.Supp. at 228 (emphasis original).

■ As applied to a decision on the merits under the standards set out in § 706(2)(A), we believe the inquiry required by the EAJA is twofold. Where the government's litigation position depends on a defense of the agency's application of an undisputed legal standard to the facts of a given case, a finding that the agency's action was arbitrary, capricious, or an abuse of discretion, is determinative of the private parties' right to fees under the EAJA. This is so because wherever the government's litigation position is simply a defense of the agency's interpretation of factual matters, the "reasonableness" of agency's action and the litigation position are precisely the same. If the agency's interpretation of the facts is arbitrary, then so is the government's decision to defend the agency's interpretation.

■ There is a second possibility, however, even under the narrow review standards of § 706(2)(A): that the agency action must be set aside because it is "otherwise not in accordance with law." *See also* § 706(2)(C). Where the government's legal position hinges on a disputed interpretation of the governing law, the fact that the agency decision was set aside is not dispositive. It is certainly possible for the government to argue a reasonable, though erroneous, interpretation of controlling laws or regulations. This is precisely the type of situation where the legislative history indicates the government's position may be deemed "substantially justified." *See* H.Rep. No. 1418, *supra* at 14, U.S.Code Cong. & Admin.News at 4993. Thus, where the government's position on questions of law has been found to be in error, the fact that an agency decision has been set aside under the standards of the APA should not be dispositive on the question of the government's liability for fees.

■ Where the dispute is essentially over the governing legal standard, one additional question need be considered before the government's position may be deemed substantially justified. Assuming the government's "reasonable" though erroneous interpretation of law were correct, would the agency action have been sustained? This is but another way of saying that the government's interpretation of law

---

9. As indicated *supra,* in addition to the experimental standard employed in § 2412(d), Congress also subjected the United States to fees where it acts in bad faith, or plaintiff satisfies the common benefit or common fund test normally applied to private parties. § 2412(b).

10. Both the "bad faith" exception and Fed.R.Civ.P. 37(a)(4) refer to position of the losing party in the litigation. *See F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 128–30, 94 S.Ct. 2157, 2164–2166, 40 L.Ed.2d 703 (1974) (discussing American rule on attorney's fees); *Persson v. Faestel Investments, Inc.,* 88 F.R.D.
668 (N.D.Ill.1980) (Rule 37 refers to the position of the party in opposing motion for discovery).

While we recognize that Congress cited Rule 37(a)(4) as the source for the substantially justified language, H.Rep. 96–1418, *supra* at 18, 4997, we reject defendant's attempt to apply a "no genuine dispute" or "frivolousness" standard to the EAJA. The legislative history, canvassed in detail above, could not be clearer in rejecting such a standard. *See id.* at 14, 4993 (rejecting the standard proposed by the Department of Justice as too "restrictive").

must be controlling on the underlying dispute. It will not do for the government to put forward a "reasonable" legal interpretation which, even if adopted, would not save the agency action. In such a case the arbitrariness of the underlying action exists independently of the purported dispute over legal standards.[11]

■ Applying this framework to the facts in *Grand Boulevard,* it is apparent that the government's position was substantially justified. The sole issue on which plaintiffs prevailed was purely a question of HUD's legal obligations to review the Community Development Block Grant (CDBG) application under the goals and objectives of national housing policy as established in the Housing and Community Development Act of 1978, 42 U.S.C. § 5313 note (1976), and the CDBG statute, 42 U.S.C. § 5304(a)(4)(C)(i).[12] There was no dispute with respect to the only issue on which plaintiff prevailed on any underlying facts. The government contended, based on its view of applicable law and regulations, that its review of the CDBG application was limited, that the application of federal housing policy was to be addressed by the CDBG applicant and not HUD, and HUD was legally obligated to approve projects which eliminate slums or blighted areas, *see* 24 C.F.R. § 570 (1980). Our statement of the scope of the remedy and the formulation of relief on the merits indicate that our decision was based purely on an interpretation of the governing law. After quoting a decision by Judge Crowley on a similar question, we stated

> [w]e agree with Judge Crowley that plaintiffs are not entitled to any guarantee of replacement housing in their neigh-

borhood. Nor are they entitled to a guarantee of the preservation of all sound housing. They are not entitled to prevent the much needed housing opportunities offered by Paul G. Stewart Phase IV.

Judge Crowley also stated, however, that a reasonable opportunity for relocation in the neighborhood is a "requirement" not merely an objective. [*Mejia v. HUD,* 518 F.Supp. 935 (N.D.Ill.1981)] We have found that HUD is also bound by the housing policy expressed in § 1441(a)(c) [sic] and § 5313.

. . . . .

The statutes relied on by plaintiffs do not require the City to forego a viable urban renewal project such as [Phase IV] in order to avoid displacing neighborhood residents. Nor do these statutes require the City to preserve all sound housing. These statutes do, however, require HUD to use its power to disburse, withhold and condition CDBG funding so as to discourage the wholesale displacement and destruction of neighborhoods.

HUD's unconditional approval of the City's CDBG application in 1978 and 1979 was an abdication of this responsibility. We stress again that plaintiffs are entitled to no guarantee that housing objectives will be obtained. . . .

. . . . .

The "commensurate" relief in this case is for HUD to require the City to review its plan for slum clearance in the 41st and King area to determine what means exist, if any, for the preservation of sound housing in that area, and to minimize the displacement of residents. We stress again that the City is required only to

---

**11.** In the instant case it is clear that were the government correct in its interpretation of the CDBG and related statutes the agency's action in approving the City's CDBG application for Phase IV would not have been set aside under § 706(2)(A). *See* slip op. at 21–24, 27–31, 31–35. *See* note 12, infra.

**12.** Plaintiffs also contend that HUD's approval of the Phase IV project violated the requirements of Section 8 of the Housing Act of 1937, 42 U.S.C. § 1437f (1976 & Supp. III & IV, 1979 & 1980), the National Environmental Policy Act

(NEPA), 42 U.S.C. § 4321 *et seq.* (1976), and the Uniform Relocation and Real Property Acquisition Act of 1970, 42 U.S.C. § 4630 (1976). On each of those issues summary judgment was awarded to the government. *See* slip op. at 27–40. Nevertheless it is clear, and defendant does not dispute, that under the applicable definition plaintiff is a "prevailing party." *See* H.Rep. 96–1418, *supra* at 11, 4990; *Bradley v. School Board of the City of Richmond,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

consider those means which would be consistent with the revitalization proposed for the area.

Slip op. at 19–21.

We quote at length from our decision on the merits in *Grand Boulevard* to make it clear that it did not involve a finding that development of the Phase IV project would be contrary to law or that HUD's ultimate acceptance of the City's CDBG application would constitute an abuse of discretion, or even that plaintiffs are entitled to preservation of the housing at issue or replacement housing within the community. The sole issue on which plaintiffs prevailed was HUD's obligation under the law to require consideration of certain aspects of national housing policy not contained in the City's CDBG application. Whether HUD's position was "substantially justified" therefore depends on whether there exists a reasonable basis for its argument that such consideration was not required. We conclude that there was.

HUD's reliance on the truncated review procedure and its limited function under the CDBG statute, *see* 42 U.S.C. §§ 5304(a), (f), 5403(c), the desire to minimize "front-end review of local development programs", *see* S.Rep. No. 963, 93d Cong.2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin. News 4273, 4324, and the fact that a primary purpose of the CDBG program is to eliminate slum and blighted areas combine to provide a reasonable basis for its position in this lawsuit. *See* slip. op. at 15–17 & n. 6. At least one court has accepted HUD's position, albeit we believe erroneously. *See Hernandez v. Pierce*, 512 F.Supp. 1154 (S.D. N.Y.1981). While we rejected that argument in *Grand Boulevard* because the expressions of policy we refer to "are not precatory and action taken without consideration of Congressional statements of policy or in conflict with them will not stand", citing *United States v. Winthrop Towers*,

628 F.2d 1028, 1035 (7th Cir.1980), we cannot say that the position of the United States was unreasonable or the type of action Congress intended to discourage in passing the EAJA. For that reason, plaintiffs' motion for fees under 28 U.S.C. § 2412(d) is denied in *Grand Boulevard Improvement Association v. City of Chicago*, No. 80 C 4760.[13]

■ Applying the same framework to *Coleman*, we conclude that the government's position in that case was not substantially justified. Plaintiffs succeeded in their attempt to enjoin the sale of South Shore Beach Apartments on two grounds: HUD's decision to reduce the deed restriction prohibiting the conversion of the building to condominiums from twenty to ten years and HUD's decision to limit § 8 subsidies to elderly residents were found to be abuses of discretion. Neither decision involved any disputed interpretation of law relied on by the agency; rather, both decisions were simply made by the agency without support in the record.

Kalish's brief statement on the deed restriction fails both parts of the *Overton Park* [*v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)] test. Kalish failed to consider all the relevant factors, and the record indicates that the factors he did consider were discussed in a sketchy and conclusory manner rather than in some reasoned fashion. The Chicago area staff, after careful consideration of the question, has concluded that the statutory mandates of HUD, as well as HUD's duty to minimize displacement under 24 C.F.R. § 290.20 (1981), required that a twenty year restriction on condominium conversion be placed in the deed. Kalish made no considered attempt to explain why this conclusion was erroneous. Accordingly, this court holds that the decision to reduce the restriction from

13. The government also contends that plaintiffs are not entitled to fees for that portion of their legal work which is attributable to issues upon which the government prevailed, or that portion of the fees relating to plaintiffs' unsuccessful claims against the State and private defendants. In light of our conclusion that the government's position was substantially justified, our subsequent discussion in *Coleman* on these issues does not apply to *Grand Boulevard*.

twenty to ten years was arbitrary and capricious, and must be set aside.

*Coleman,* slip op. at 26.

There is literally nothing in the record which indicates how HUD arrived at its conclusion that it would set aside only seven units for non-elderly tenants. The record contains no data regarding the ages of those tenants eligible for § 8 assistance, nor does it contain any statement explaining how the figure seven was reached. On the record presently before the court, it is impossible to determine whether HUD's allocation for non-elderly tenants was insufficient, and subjected those tenants to an unacceptable risk of displacement in violation of 24 C.F.R. §§ 290.20, 886.301 (1981). Moreover, the court cannot determine whether the age restriction is at odds with § 8 itself....

*Id.* at 27–28.

■■■ The government attempted to offer a plausible explanation for the administrative action by proffering additional facts to support HUD's determinations which were not contained in the administrative record. But, as we held in the opinion on the merits, "agency action may only be sustained on the rationale offered by the agency at the time the action is taken." *Id.* at 32 n. 20; *see also id.* at 19. The principle that agency decisions must be supported by evidence in the "record" and that the reviewing court is limited to consideration of the reasons for a decision asserted by the agency at the time of the decision is well settled. *See id.* at 10–13, 19. Where the government offers post-hoc rationalizations for unexplained agency decisions which, even if they were

believed, could not save the agency action, we do not believe that position is reasonable.

This is a case where private persons, confronted with unexplained agency actions, challenged the agency in court and won. The issues upon which plaintiff prevailed did not, unlike *Grand Boulevard,* involve any disputed interpretations of law. This is just the type of case where Congress expressed a desire to make the government liable for fees so as to discourage the defense by the government of arbitrary agency actions. The government's position in *Coleman* was not substantially justified.[14]

The government nevertheless argues that it should not be liable for that portion of the attorneys' fees attributable to issues which were decided adversely to the plaintiff. The government correctly points out that several grounds urged by the plaintiffs in attacking the proposed sale of South Shore were rejected. Among the issues raised by a plaintiff upon which the government prevailed was the adequacy of the notice of the proposed sale, *see Coleman,* slip op. at 14–17, the sufficiency of HUD's explanation for rejecting the sale of the building as a cooperative, *id.* at 17–21, the impact of HUD's failure to conduct an income survey, *id.* at 21–23, and the sufficiency of HUD's displacement analysis and conclusions, *id.* at 23–25.

■■■ The EAJA does not indicate the scope of recovery that should be granted to a prevailing party who has not succeeded on all issues raised in the case. We have canvassed the legislative history and find no guidance on this question. We do know, however, that the determination of whether

---

14. The government, in arguing the fees question, does not offer a defense of its position on the § 8 or length of the deed restriction issues. Rather, it argues that since the government prevailed on several other issues, its position was "substantially justified." The argument misinterprets the proper application of the standard. We discuss separately, *infra,* the question of whether plaintiffs are entitled to compensation for work performed on issues upon which they did not prevail. But where plaintiffs clearly prevailed on the action as a whole, and, as in *Grand Boulevard,* the govern-

ment does not dispute that plaintiffs are "prevailing parties," the substantially justified test must be applied first to the position of the government on the issues where plaintiff won—assuming the victory was of sufficient magnitude to qualify plaintiffs as prevailing parties. The fact that the government position was successful on some issues is not enough to block an award of fees where plaintiffs are prevailing parties and the position of the government on the issues where plaintiff prevailed was unreasonable.

plaintiffs qualify as a prevailing party under the meaning of the statute is to be guided by the existing case law under the Civil Rights Attorney's Fees Act, 42 U.S.C. § 1988. *See* H.Rep. No. 1418, *supra* at 11, U.S.Code Cong. & Admin.News at 4990 ("It is the committee's intention that the interpretation of [prevailing party] be consistent with the law that has developed under existing statutes."). Under these circumstances, absent any indication to the contrary in the legislative history, we think it appropriate to look to those same cases to determine the standard to be used in awarding fees where a private party has prevailed on only some of the issues litigated.

There is a substantial body of case law in this circuit under § 1988 on the question of the scope of recovery where plaintiff's victory on the merits is less than complete. In *Syvock v. Milwaukee Boiler Manufacturing Co.,* 665 F.2d 149 (7th Cir.1981), the court attempted to reconcile the potentially conflicting case law. *Compare Sherkow v. Wisconsin Department of Public Instruction,* 630 F.2d 498 (7th Cir.1980) *and Northcross v. Board of Education,* 611 F.2d 624 (6th Cir.1979) *with Busche v. Burkee,* 649 F.2d 509 (7th Cir.1981) *and Muscare v. Quinn,* 614 F.2d 577 (7th Cir.1980). The plaintiff in *Syvock* successfully litigated his claim against defendant for age discrimination in employment in violation of 29 U.S.C. §§ 623–634 (1976), but lost on the issues of the employer's willfulness and mitigation of damages. *Syvock,* 665 F.2d at 162. The district court reduced the award of attorney's fees accordingly, relying on the opinion in *Muscare v. Quinn,* 614 F.2d 577 (7th Cir.1980). The court of appeals reversed, finding the district court's reliance on *Muscare* misplaced. The central factor identified by the court in determining whether plaintiff is entitled to all or only a portion of his attorney's fees is whether plaintiff "essentially succeeded" on his claim. The standard is drawn largely from the decision of the Third Circuit in *Hughes v. Repko,* 578 F.2d 483, 487 (3d Cir.1978):

[A] prevailing party on a particular claim is one who fairly can be found by the district court to have essentially succeeded on such claim, as "claim" is used in Fed.R.Civ.P. 10(b). We say "essentially succeeded" because in many cases a party may prevail on his basic claim but not all aspects thereof.

After quoting the above language the *Syvock* court held:

Just as the plaintiffs Hughes "essentially succeeded" in their section 1982 claim against Mrs. Repko, plaintiff Syvock "essentially succeeded" in his ADEA suit against Milwaukee Boiler. Syvock's failure to prevail on the question of willfulness and mitigation of damages should no more diminish his award than did the Hughes' failure to succeed on the punitive damage issue or their contention that the attorney's fees issue was a jury question.

665 F.2d at 164.

What distinguishes *Syvock* and *Hughes* from *Muscare,* where the court held only a partial award of fees was warranted, is the absence of an independent claim resting on a separate basis where plaintiff was unsuccessful. In *Muscare* plaintiff challenged the constitutionality of a grooming regulation of the Chicago Fire Department and claimed that his disciplinary hearing violated his procedural due process rights. The court upheld the grooming regulation but found for plaintiff on the adequacy of the process afforded. *Syvock,* 665 F.2d at 163. Similarly in *Busche v. Burkee,* where an award of full fees was reversed, plaintiff presented three separate claims of alleged constitutional violations and prevailed on only one. The critical distinction between the cases is that

[t]he two [claims] on which he failed to prevail were not mere *aspects* of a larger claim that affected the amount of damages he was due for the claim on which he did succeed. They were independent claims, as was the challenge to the constitutionality of the grooming regulation in *Muscare,* on which he did not succeed.

*Syvock,* 665 F.2d at 165 (emphasis original).

 The distinction drawn by the court of appeals rests on an identification of

whether the "claims" presented by plaintiffs are separate and distinct factual matters or merely different methods of attacking the same underlying conduct. The focus is not whether the plaintiffs prevailed on each legal theory, but whether they "essentially succeeded" in their claim against the underlying conduct by examining not whether the plaintiffs prevailed on each legal theory, but rather whether they "essentially succeeded" in their claim against the underlying conduct. The focus on claims with an independent factual base is supported by the citation to the "separate transaction or occurrence" language of Fed. R.Civ.P. 10(b); See also Fed.R.Civ.P. 13(a) (compulsory counterclaims); Fed.R.Civ.P. 15(c) (relation back of amendments). The test of whether a claim involves a "separate transaction or occurrence" depends on the factual relationship and evidentiary foundation of one or more "claims". See generally 3 J. Moore, Moore's Federal Practice ¶¶ 13.13, 15.15 at 13–297 to 310, 15–198 to 208 (1982). Where the evidence indicates there is but a single claim, and plaintiffs argue one or more legal theories, the fact that they prevail on only some of the theories should not be used to reduce the amount of their fee award.[15]

The application of this test to the *Coleman* case is not easy. Plaintiffs attacked HUD's sale of South Shore on several different grounds and "prevailed" on two of them.[16] But we are nevertheless convinced that under the framework adopted by the court of appeals plaintiffs have essentially succeeded on a single claim and therefore are entitled to recover all fees reasonably incurred in their effort to have the sale set aside. The factual basis for the entirety of plaintiff's attack is contained in a single administrative "record."[17] The evidence relevant to each of plaintiffs' claims substantially overlapped and, of course, all of the claims concerned the sale of a single piece of property. Moreover, while plaintiffs' arguments depended in part on different regulations, each argument was tied to a single overriding theme—that HUD failed to consider the objectives of national housing policy as identified in applicable laws in deciding what to do with South Shore. Finally, the ultimate relief plaintiff obtained—enjoining the sale of South Shore—is substantially the same as plaintiff would have been entitled to had they prevailed on their other theories in the case. That fact,

**15.** This approach is consistent with result reached and the test applied by the court in *Muscare*. Plaintiff's claim that the grooming regulation was unconstitutional and his challenge to the procedures used in his disciplinary hearing were completely separate claims supported by wholly independent evidentiary and legal considerations.

**16.** While it is true that the government prevailed on the other issues raised by plaintiff, HUD's attempt to use those victories in arguing that plaintiff should not receive compensation for all of their effort in contesting the sale of South Shore is slightly disingenuous. On the issue of the adequacy of the notice of the proposed sale we agreed with plaintiff that the notice was legally defective but held that the defect was insufficient to set the sale aside because plaintiff had failed to demonstrate that the defect infected the agency decision making process or prejudice their right to participate in that process. Slip op. at 16. We also agreed with plaintiffs that HUD's on the record reasons for rejecting the cooperative option favored by plaintiffs was inadequate but held that too was insufficient to set aside the sale because the record reasons for rejecting the condominium option applied with equal force

to cooperatives, *id.* at 19–21. Thus, while the government ultimately prevailed on those issues, the necessity for litigating the question was caused by the inadequacy of the record created by defendants.

We note that were we to apply the standard enunciated by the Sixth Circuit in *Northcross*, 611 F.2d at 636, that "[s]o long as the party has prevailed on the case as a whole the district courts are to allow compensation for hours expended on unsuccessful research or litigation unless the positions asserted are in bad faith", plaintiffs would clearly be entitled to all of fees incurred in pursuing this litigation. While perhaps reconcilable on its facts with the decisions reached by this circuit, the broad language of the standard appears to be at odds with the formulation adopted in *Syvock*.

**17.** We note, as our opinion on the merits indicates, the "record" put together by HUD was less than adequate in several respects. Moreover, many of the documents which clearly should have been part of the administrative record for purposes of review were uncovered and presented by plaintiffs rather than defendant.

while not dispositive, is indicative of the fact the attack on the sale of South Shore was but a single claim upon which plaintiff "essentially succeeded." The result of that victory is that the displacement of tenants which may have resulted but for plaintiffs' victory has been substantially reduced.[18] We believe that *Coleman* involved one transaction or occurrence and that plaintiffs have essentially succeeded in their attack on HUD's disposition of the South Shore Beach Apartments and therefore are entitled to all fees reasonably expended in this litigation.

■■■ Defendants' final line of attack is that the amount of time counsel spent in preparing this case and the fees charged are not reasonable. We reject that contention. The total amount claimed by counsel for preparing the case, the discovery and document review, and briefing and arguing the motions for summary judgment is $28,-466.00, spread over the work of three attorneys. The rate charged is $75.00 per hour for two of the attorneys and $65.00 for the third. Given the nature and complexity of the issues involved here and the high quality of the submissions of plaintiffs' counsel we find both the amount of time spent and rate of compensation charged to be fair and reasonable. We do not share the view of the United States that a total of 60 hours spent preparing and briefing a detailed summary judgment motion based on a sketchy and frequently inadequate administrative record is "excessive." Nor do we find the time spent by counsel reviewing and preparing the case in conference or meeting with clients to be unreasonable. We agree with plaintiffs' citation to the statement in *Unemployed Workers Organiz-*

*ing Committee v. Batterton,* 477 F.Supp. 509, 515 (D.Md.1979) that

> [a]lthough the detail of [counsel's] time log does reveal some non-legal functions within his total billing, the overall presentation appears to be both fair and reasonable, given the nature and extent of his involvement in this case. It is not the function of the courts, in reviewing fees, to second guess every minute detail of time spent by an attorney in working on a case.

In summary, we hold that plaintiffs in *Grand Boulevard Improvement Association v. HUD,* No. 80 C 4760, are not entitled to fees pursuant to the Equal Access to Justice Act as the government's position in that action was substantially justified. We hold that plaintiffs in *Coleman v. HUD,* No. 81 C 1284, are entitled to attorneys fees under the Equal Access to Justice Act in the amount of $28,466.00. Accordingly, in No. 81 C 1284, judgment will enter in favor of plaintiffs and against the United States of America in the amount of $28,466.00 with instructions that it be paid directly to plaintiffs' counsel, the Legal Assistance Foundation of Illinois.

---

**18.** The government contends that plaintiffs' victory is illusory because all they achieved was having the case remanded to the agency for development of a proper record indicating the reasons for the agency's decision. As we indicate in our discussion of Grand Boulevard, where the remand is necessitated by a reasonable but erroneous interpretation of law by the agency, that fact may be entitled to some weight in determining if the government's position was substantially justified. However, where reversal of the agency action is necessitated by a "failure to explain administrative action [so] as to frustrate effective judicial review", *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), a remand for further proceedings is generally the only relief available to the plaintiffs. *See* slip op. at 28. That fact can hardly be relied on by the government as a grounds for derogating the relief obtained by plaintiffs.